UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA              :

     - v -                          :
                           13 CR 560 (PGG)

INGRID LEDERHAUS OKUN,                :

              Defendant.      :

- - - - - - - - - - - - - - - - - - x

## INGRID LEDERHAUS OKUN'S SENTENCING MEMORANDUM

             David E. Patton, Esq.
             Federal Defenders of New York, Inc.
             Attorneys for Ingrid Lederhaus Okun
             52 Duane Street - 10th Floor
             New York, New York 10007
             Tel.: (212) 417-8700


Sabrina P. Shroff, Esq.
  Of Counsel


TO:  Preet Bharara, Esq.
     United States Attorney
     Southern District Of New York
     One St. Andrew's Plaza
     New York, New York  10007
     Attn:  Rosemary Nidiry Esq.
          Assistant United States Attorneys

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA              :

        - v -                          :
                                              13 CR 560 (PGG)
INGRID LEDERHAUS OKUN,                 :

              Defendant.    :

- - - - - - - - - - - - - - - - - - x

## INGRID LEDERHAUS OKUN'S SENTENCING MEMORANDUM

This sentencing memorandum is submitted on behalf of Ingrid Lederhaas Okun ("Ingrid") in support of her request for a sentence of 6 months, the sentence recommended by the Department of Probation. The Probation Department has calculated the same guideline as the plea agreement, and we agree with Probation, for the reasons set forth below, that a sentence of 6 months in custody is "sufficient, but not greater than necessary to comply with the purposes of sentencing." 18 U.S.C. § 3553(a). In punishing Ms. Okun, the Court should know that Ingrid has lost everything – her husband, her job, her prospects for a job, her home, and faces a largely empty future. She will remain a felon for the rest of her life. A 6 month sentence of incarceration followed by years of supervised release is sufficient punishment.

## BACKGROUND

### I.   MS. LEDERHAUS-OKUN'S HISTORY AND OFFENSE CONDUCT

About eight years ago, in late 2005, Ingrid Lederhaus Okun stole a pendant from her then-employer, Tiffany & Co. ("Tiffany"). Until that moment, Ingrid had been an honest and hard working person completely dedicated to her job and employer. As detailed below, as a Vice President at Tiffany Ingrid was able to take jewelry from the store and write it off as long as the value was under $25,000. At times, Ingrid would steal jewelry, sell it and keep the money. To Tiffany, the stolen jewelry would appear as a write off. This conduct went undetected for years until Ingrid was laid off by Tiffany. It was only then that Tiffany discovered the theft.

Well raised and well educated, Ingrid's life appeared picture perfect and gave no indication of her inner psychological imbalance. She lived with her husband, Robert, in a beautiful home in Darien, Connecticut. Both Ingrid and Robert had good jobs and earned very good income. Both traveled for their work and both seemed to have a large group of friends. A couple in their late 40s, they worked hard, socialized and entertained their family and friends. Although Ingrid and Robert did not have children of their own, Ingrid had played a large role in raising Robert's two children. To their friends, they

3

appeared the perfect couple - happy, successful and well liked.

Everyone who knew Ingrid describes her as a kind and considerate friend. She was the person one would call for advice, or to vent about a mishap in one's life. No one noticed that Ingrid never talked about herself. No one, not even her husband, noticed that Ingrid hardly ever discussed her work or her feelings. No one stopped to question whether Ingrid needed help.  It was only when Ingrid was arrested that the hidden demons plaguing her -- her depression, her pathological desire to help others, the severe problems at work and at home - were revealed, and the image of perfection she struggled so hard to maintain was shattered. Until then, no one really knew Ingrid Lederhaus Okun.

Ingrid worked for Tiffany for nearly 25 years. Ingrid was a good employee - she thrived on doing her work well and being well liked. *See* letters from family members and friends, attached as Exhibit A.  To Ingrid, the happiness and morale of her subordinates was just as important as her boss' approval. Until she was in her late 30s, Ingrid worked with a singular purpose - to do well for the company that had hired her fresh out of college.

Settled in her career, she and her husband tried to have a baby. Both were excited and neither anticipated anything but a

4

normal process of trying and conceiving a child. Unfortunately, things did not work out as planned. Despite trying everything – from acupuncture to IVF – Ingrid was unable to conceive. To make matters worse, her relationship with her husband, and her marriage, began to unravel under the strain of infertility. Neither Ingrid nor her husband acknowledged the pain and malaise in the marriage.

Feeling incomplete and wholly inadequate as a woman and at home, Ingrid sought solace by burying herself even more in her work. In late 2005, Ingrid applied for a promotion at Tiffany. She did not get the job and the timing of the loss was hard on her. Ingrid now felt even more beaten and depressed. Nevertheless, Ingrid continued to work hard. Sadly, matters at work continued to deteriorate. Ingrid's new boss did all she could to freeze Ingrid out of her work and her job. As described in the letter from Dr. Michael B. First, Ingrid would spend months working on a project, only to have its final presentation cancelled. No notice and no explanation would follow. Eventually, in February 2013, she was terminated from Tiffany when the company was retrenching.

Marginalized into near obscurity at Tiffany, Ingrid pretended that everything was the same. She continued to go to work each day as though nothing had changed. Each day she

pretended to those who worked for her that all was well. No one had a clue – not her husband, not her friends and certainly not her parents – that Ingrid's responsibilities at work had been reduced drastically. Instead of confronting the problem and her growing depression, she bottled up every last feeling that was eating away at her; whenever she felt down or depressed, she stole. Eventually, Ingrid stole merchandise totaling $1.3 million in value.

To be clear, Ingrid did not need the money. As the letter from Robert (her now ex-husband) explains, Ingrid spent more money on others than she ever did on herself. The family was well off and could have afforded the same life style without her theft. For reasons that can only be explained by a psychiatric illness, Ingrid took huge risks with her life and her freedom each time she stole. The risk did not pay off. In July of 2013, Ingrid was arrested.

It is no exaggeration to say that Ingrid's life is now completely ruined. Her arrest, which was publicized in a press release issued by the United States Attorney's Office, destroyed all semblance of normalcy for her and her family. The media frenzy that followed has had long-lasting repercussions.

Ingrid's parents, elderly and in poor health, were swarmed by the press and nearly died from the shock of their daughter's

arrest. It is impossible to adequately describe to the Court the fear and pain that was thrust upon them when they learnt of their daughter's shocking arrest, not from her or her family, but from the press.

Ingrid was about to start a new job; upon learning of her arrest the company withdrew their offer of employment. No one will hire her again. Indeed, so great was the notoriety of the case that her husband, Robert, was placed on unpaid leave from his job in finance.

Barely three weeks after her arrest, Ingrid's husband announced he was going to seek a divorce. The arrest and criminal case placed additional stress on their relationship, and as much as Ingrid needed Robert's support, she acquiesced to his demand. True to form, she put Robert's needs ahead of hers and made the divorce as easy and amicable as possible.

To right her wrong as much as she could, Ingrid agreed to plead guilty almost immediately. She sought no discovery and did not engage in any motion practice. She agreed to restitution and forfeiture - giving all her assets to the United States. In this regard, Ingrid has agreed to forfeit her share of the sale of her house, her bank accounts, her retirement account, and her IRA, so as to make restitution to the United States Attorney's Office.

## II.   MS. LEDERHAAS-OKUN'S PSYCHOLOGICAL CONDITION

From the moment of her arrest, Ingrid has been asked the same question – why?  Why do it? Her actions can only be understood if one accepts that some people do self-destructive things as a way of coping with life's disappointments. Her inability to cope with the failings and setbacks in life is what led Ingrid to commit a very serious offense. Ingrid understands that she deserves to be punished for what she did to Tiffany. At the same time, however, her offense was not motivated by greed or a desire to harm, but by Ingrid's desperate effort, however misplaced, to compensate for the pain, depression and grief she felt over her perceived failures – the failed pregnancies, the failed IVF treatments, her failing marriage, and her marginalization at work –the only place she had ever succeeded. Throughout the time Ingrid was stealing from Tiffany, she was a severely compromised person.

A depressed person and her self-worth reached a new low. Her self-loathing worsened with her feelings that she was a fraud – outwardly together but inside a failure – her inability to confide or seek help from others, or to create relationships that did not involve her supporting others.

Although Ingrid and her husband got along with each other, they shared no intimacy. In the aftermath of two failed IVF

8

treatments and several miscarriages, Ingrid and Robert acted as though they had tried their best at something, failed and now the matter was behind them. Neither Ingrid nor Robert talked to each other about their inability to have a child. For Ingrid it was clearly a more problematic issue – it was she who was unable to have a child; Robert had children with his first wife. So, the "fault" was hers. Never once did she seek any help with this feeling of being a defective woman.

The Psychological Report of Dr. Michael First details Ingrid's personal difficulties and the trauma she suffered as a woman who was unable to get pregnant and miscarried repeatedly. Report by Michael First, dated August 20, 2011, attached as Exhibit B along with his curriculum vitae.

This pattern of periodic loss marked by failed pregnancies left her yearning for the opportunity to be a mother herself; a complete woman so to speak. Report at 4 to 5. Unlike others who suffer similar losses, and as noted by Dr. First, Ingrid lacked the ability to cope with her losses. Her personality made it impossible for her to seek out personal or professional help. As Dr. First notes, Ingrid "has been suffering from other Specified Personality Disorder with avoidant and obsessive compulsive traits" and "Adjustment Disorder." Report at 7.

After her failed IVF treatments, Ingrid had a dissociative

experience for a protracted period of time. The disassociation was a reflexive coping mechanism during a time of extreme stress. Disassociating allowed Ingrid to tolerate the trauma of failure -- yet another failed attempt to be a mother, the loss of her work, her parent's health issues, and her own surgeries. Ingrid's extreme discomfort at sharing any part of herself leads to a diagnosis of personality disorder characterized by a mixture of avoidant and obsessive-compulsive traits. Report at 7. Many aspects of Ingrid's personality, namely her closed off nature and inability to seek comfort and help from others, her pathological need to accommodate and please others, avoid confrontations, and her single-minded devotion to her work at Tiffany predisposed her to some psychological break which lead her to undertake very risky behavior – stealing from her job. Report at 5, 7.

III. **INGRID'S PERSONAL LIFE**

Although Ingrid had no children of her own, she was very involved with, and helped raise Robert's two sons from his prior marriage. It is important for the Court to understand that in doing so, she did provide a stable, loving and happy home during those years. Both boys have submitted letters to the Court describing the positive family environment that Ingrid created and maintained for them. *See* Exhibit A.

10

David depicts Ingrid as a good and caring mother, who was very involved with the children's lives in a positive way. He describes the relationship between his mother and Ingrid as a close one filled with respect. Both boys, David and William talked to Ingrid when they had problems. Both boys recall the family home as a welcoming one for their friends. Ingrid was always kind and helpful. Further, both David and William note that Ingrid encouraged school work and their professional success. When they were young, she made sure they did their homework, and was quick to go to school and meet with teachers if there was any problem. It is important to note that throughout this time of William and David's life, Ingrid was depressed, yet shared her feelings with no one. She battled her back surgeries, helped her parents with their medical issues, worked at Tiffany's, gave help to her neighbors, Robert's children and friends, all the while feeling worthless and depressed. As noted by Dr. First, Ingrid is simply unable voluntarily to seek out help or relief from the pain she is experiencing.

Even after her arrest Ingrid did not seek help or support from others. Instead, she set about trying to do the right thing by pleading guilty quickly, and doing what others wanted of her. She plead quickly as she wanted to acknowledge her guilt and

because she wanted to spare her parents the continued shame of seeing their daughter's case in the newspapers. When Robert asked for a divorce, she complied.

**ARGUMENT**

**A SENTENCE OF 6 MONTHS IS MORE THAN SUFFICIENT TO MEET THE GOALS OF SENTENCING PURSUANT TO 18 U.S.C. 3553(A)**

I.   **THE STATUTORY STANDARD**

The sentencing statute directs the Court to impose a sentence "not greater than necessary to comply with the purposes of sentencing." These purposes require the sentence imposed to:

A) reflect the seriousness of the offense, promote respect for the law, and to provide just punishment for the offense;

B) afford adequate deterrence to criminal conduct;

C) protect the public from further crimes of the defendant; and

D) provide the defendant with needed educational or vocational training, medical care, or other treatment in the most effective manner.

18 U.S.C. 3553(a)(2).

In determining the lowest sentence necessary to achieve these objectives, this Court is directed to consider the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available and the applicable guidelines range; and the need to avoid unwarranted disparity among similarly situated defendants. 18 U.S.C. 3553(a)(1)(3)-(6).

## II.   THE ADVISORY SENTENCING GUIDELINES

Ingrid pled guilty pursuant to a plea agreement that calculated an advisory Sentencing Guidelines range of 37 to 46 months' imprisonment, based on an offense level of 21 and a criminal history category of I.  PSR ¶ 5.  The PSR calculates the same advisory Guidelines range.  *Id.* ¶¶ 30, 33, 73.  Ingrid has no objections to this calculation.

Cognizant of the advisory Guidelines, the Probation Department recommends a sentence of 6 months incarceraton, followed by a period of supervised release. Notably, the Probation Department makes sentencing recommendations in accordance with its Monograph 107, which requires the Probation Officer to consider the statutory factors related to sentencing, including the specific nature of the crime (violent? sophisticated? affecting many victims?); the actions of the defendant (what is her history? has she been cooperative? has she demonstrated true acceptance of responsibility?); just punishment (what role did she play in the offense? what were her motivations? what is needed to keep her from re-offending?); and protection of the community.

The Probation Department in this District only rarely recommends a non-Guidelines sentence - its recommendation here for such a sentence reflects the truly unique circumstances of

13

this case and should be followed by the Court.

## III. THE SIX MONTH SENTENCE URGED BY PROBATION IS APPROPRIATE

This Court should follow the recommendation of the Probation Department because (1) the advisory Sentencing Guideline applicable here is not reflective of past sentencing practices, is not the product of analytical study, and therefore deserves no special deference; and (2) consideration of the statutory factors demonstrates that time served plus a period of supervised release is the most appropriate sentence for Ingrid.

### A. The Problematic Nature of U.S.S.G. § 2B1.1 Supports a Non-Guidelines Sentence of Six Months

In *United States v. Kimbrough,* the Supreme Court distinguished between specific Sentencing Guidelines provisions based on reviews of past sentencing practices and empirical studies – and which therefore "exemplify the [Sentencing] Commission's exercise of its characteristic institutional role" – versus those that were not. *Kimbrough*, 552 U.S. at 109. The Court further explained that Guidelines not based on such studies were less deserving of deference. *See id.; Spears v. United States*, 129 S. Ct. 840, 842-43 (2009). Since *Kimbrough*, district courts have begun the process of analyzing Guidelines, finding that many are not in fact the product of any manner of expertise or review of national sentencing practices.

Section 2B1.1 is an example of one such problematic

14

Guideline. It was not designed as a codification of past sentencing practices. As the Sentencing Commission noted in its fifteen year review, so-called white collar offenders historically were more likely to receive probationary sentences; the Guidelines specifically sought to modify this practice by making a greater number of white collar offenders subject to increasing prison sentences, regardless of all other factors. *See Fifteen Years of Guidelines Sentencing* at vi-vii, 15, 44 (Nov. 2004), at http://www.ussc.gov/15_year/15year.htm (also noting that the Guidelines were re-designed to imprison white collar defendants so as "to correct past under-punishment"). This deviation from past practices was a conscious, though largely unexplained decision by the Commission.[1]

More troubling than this deviation is the fact that there is no apparent empirical basis undergirding the fraud and theft Guidelines.  Other than a desire to inflict harsher punishments on white-collar defendants, the Commission articulated little reasoning for its increased penalties. Nonetheless, since the

---

1   One purported reason was to ensure "proportionate" punishment and   adequate   deterrence.   *Id.*   at   56.   But,   proportionate punishment need not be achieved by ratcheting-up: the Commission could have chosen to provide for incarceration in fewer non-white collar cases, which might have been equally effective in accomplishing   its   sentencing   aims.   Indeed,   as   discussed   in greater detail below, there is absolutely no empirical evidence that more severe penalties have greater deterrent effects.  In fact, individuals sentenced to prison, as opposed to probation, exhibit higher recidivism rates.

enactment of the original Guidelines, the Commission steadily increased the recommended sentences for theft and fraud crimes, often with little or no empirical explanation supporting these increases.  The following table illustrates the different sentences that the Guidelines have recommended for larceny over the last twenty years:

| Year | Base Offense Level Under § 2B1.1 | Loss Amount Adjustment | Adjusted Offense Level | Guidelines Range |
|------|-----------------------------------|------------------------|------------------------|------------------|
| 1988 | 4 | 8 | 10 | 6-12 |
| 1994 | 4 | 9 | 11 | 8-14 (Zone C) |
| 2009 | 6 | 10 | 13 | 12-18 (Zone D) |

In other words, the recommended minimum sentence has *doubled* during the period and a term of community confinement, as opposed to straight incarceration, is no longer permissible under the Guidelines.  As one commentator recently observed, the fact that the same crime can supposedly warrant such different penalties over time undercuts the assertion that the Guidelines yield appropriate and reasonable sentencing recommendations. *See* Frank O. Bowman III, *Sentencing High-Loss Corporate Insider Frauds After Booker*, 20 Fed. Sent. Rep. 167, 168 (Feb. 2008).

Courts and commentators have repeatedly expressed concerns about U.S.S.G. § 2B1.1. For example, they have observed that the Guideline places undue weight on the amount of loss. *See, e.g.*, *United States v. Adelson*, 441 F. Supp. 2d 506, 509 (S.D.N.Y.

16

2006); *United States v. Emmenegger*, 329 F. Supp. 2d 416, 427 (S.D.N.Y. 2004). As Judge Rakoff noted in *Adelson*, the Commission has never satisfactorily explained why it is appropriate to accord such weight to a factor such as loss amount (or why increasing amounts should automatically result in increased penalties). *Adelson*, 441 F. Supp. 2d at 509. *See also* Statement by the Honorable Jon O. Newman to the United States Sentencing Commission at 8-9 (Jul. 9, 2009) ("it makes no penological sense to insist that nearly every extra dollar of loss should result in some extra punishment").

Indeed in this case the sixteen-level enhancement for the amount of loss is not an accurate measure of either Ingrid's culpability or the seriousness of this offense. Sixteen levels is a high enhancement within the context of the Sentencing Guidelines. A sampling of conduct resulting in similar enhancements includes trafficking in more than 200 firearms, U.S.S.G. § 2K2.1(b)(1)(E) (10 levels); committing an aggravated assault that involves more than minimal planning and results in permanent or life-threatening injury, U.S.S.G. §§ 2A2.2(b)(1) and (b)(3)(C) (9 levels total); kidnapping by employing a dangerous weapon and sexually exploiting the victim, U.S.S.G. §§ 2A4.1(b)(3) and (b)(6) (8 levels total); and obstructing justice in relation to terrorism, U.S.S.G. § 2J1.2(b)(1)(C) (12

17

levels). These all represent significantly more serious aggravating conduct, with a much greater potential for societal harm. It makes absolutely no sense to say that one who steals jewelry from a store is more concerning than one who not only kidnaps, but also employs a weapon and sexually exploits his victim. This further highlights the irrationality of § 2B1.1 and its sentencing recommendations.

In the Second Circuit approximately 41% of all individuals convicted of larceny received probationary sentences in 2008. *See U.S. Sentencing Commission Statistical Information Packet, Fiscal Year 2008 Second Circuit* at 8, available at http://www. ussc.gov/JUDPACK/2008/2c08.pdf. More strikingly, nearly 32% of all larceny defendants in the Second Circuit received a non-government sponsored below-Guidelines sentence. *Id.* at 19. This reflects the consistent judgment of courts in this Circuit that (1) probation is a completely sufficient and effective sentence for theft offenses and (2) the advisory Guidelines recommend too great a penalty in a substantial number of theft cases. These results also accord with national trends, which demonstrate that a majority of defendants convicted of white-collar offenses receive non-prison sentences. *See United States v. Cole*, 622 F. Supp. 2d 632, 640 (N.D. Ohio 2008) (noting that 58.8% of defendants nationally received non-prison sentences for

fraud).   In light of these issues, and the relevant practice among courts, there is no reason for this Court to defer to the advisory Guidelines in this case.

B.    **Probation's recommendation of Six Months is Sufficient to Fulfill the Statutory Purpose of Sentencing Because the Nature and Circumstances of the Offense and the History and Characterization of Ms. Okun Make Her an Extremely Low Risk for Re-Offending.**

A within guideline sentence for this broken and severely depressed 47-year-old woman is more than sufficient to comply with the goals of sentencing. Further incarceration is not necessary to prevent Ingrid from committing further crimes or to protect the public. Ingrid's innate personality, her pathological need to always pretend that everything was okay, led to have no outlet for her constant state of stress and depression. It spewed into her taking dangerous risks that led to her arrest. Her thinking was distorted by anger and feelings of hopelessness and panic about not being able to do anything right - to Ingrid she was thoroughly useless as she did not succeed at her career or at being a woman. This is not offered as an excuse for her conduct, but to attempt to explain why she continuously and repeatedly engaged in risky and destructive behavior over a period of time, and why there is no danger she will ever re-offend.

Ingrid is now in therapy, and working through her

psychological issues. She is now seeking the help she needs in order not to re-offend. In seeking therapy, Ingrid is dealing with the excruciating emotional pain she felt that led to her offense. *See* First Report. Further, it is clear that Ingrid will never expose herself, or her parents, to such a public humiliation ever again.

It is equally clear that Ingrid will never have the opportunity to commit such a crime again.  Ingrid's life before her arrest is truly a thing of the past.  She has lost the ability to get a job in her field; no one will hire her. She has lost her husband and her home. After prison, she will have to start over. At that point, she will have no home (it now belongs to the United States), no bank account, no job, no husband and her life will bear almost no resemblance to her life before July 2, 2013.

Ingrid's letter to the Court reflects her profound, sincere remorse. *See* letter from Ingrid Lederhaas Okun, attached as Exhibit C. Her focus, upon release, will be to try to make this up to her elderly parents, as well as to seek forgiveness from them. There is nothing to indicate that she is, or remains, a danger to society.  Notably, older offenders like Ingrid have much lower recidivism rates than younger defendants, and elderly defendants have minimal risk of recidivism. *See*, *e.g.*, *Measuring*

20

*Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* 28 (2004) (finding that recidivism rates drop dramatically for older offenders). Recidivism rates are also lower for female offenders. Id.  These statistical facts, coupled with the fact that Ingrid's specific offense was inextricably related to her mental and emotional situation and place of employment, makes the likelihood virtually zero that she will ever engage in another offense upon her release from 6 months in prison.

Indeed, given her age, the prolonged incarceration posited by the advisory guidelines is unnecessary and too costly.  In this regard, older prisoners such as Ingrid are much more expensive for the Bureau of Prisons to maintain, because of health and mobility problems. See *Correctional Health Care, Addressing the Needs of Elderly, Chronically Ill, and Terminally Ill Inmates,* U.S. Department of Justice, National Institute of Corrections, 2004 Ed. Pp. 9-10 (reporting intensified management problems with elderly inmates in the prison setting, including the need for special physical accommodations in a relatively inflexible physical environment); Ronald H. Aday, *Aging Prisoners: Crisis In American Corrections* (Nov. 2003); Patrick McMahon, *Aging Inmates Present Prison Crisis*, USA TODAY, Aug. 10, 2003, *Nation* Section; Mike Mitka, Aging prisoners Stressing

21

Health care System, 292 JAMA 423, 423 (2004) (prison adds approximately 10 years to your physiological age).

Older inmates cost approximately three times more than the cost to incarcerate than average adult inmate. Molly Fairchild James, *The Sentencing of Elderly Criminals*, 29 Am. Crim., L. Rev. 1025, 1026 (1992) (noting then average cost of elderly inmate was $60,000, compared to $20,000 for younger inmates).

Given the exceptionally low likelihood that Ingrid would ever commit a similar offense, a sentence of more than 6 months is not necessary to provide adequate deterrence under 18 U.S.C. § 2(B), or to protect the public under subsection (c). Nor is it necessary to provide treatment or medical care in the most effective manner. To the contrary, the cost of treating older prisoners is so great that it is certainly more effective to release the elderly, whenever possible, so that their various ailments may be treated more cost-effectively outside of prison.

C. **Six Months is a Just Punishment Under the Circumstances**

Considering the nature of this offense and Ingrid's personal history, it is clear that she is among a group of relatively less culpable offenders.  The Sentencing Commission has recognized that factors bearing on a defendant's culpability include whether an offense involved violence or a weapon, the magnitude of injury to the victim, a defendant's role in the

22

offense and her acceptance of responsibility. Sentencing
Commission Research Series on the Recidivism of Federal
Guideline Offenders, *Recidivism and the "First Offender"* at 9-10
http://www.ussc.gov/publicat/Recidivism_FirstOffender.pdf.
Defendants whose crimes do not involve violence, who cause less
serious injury to society, and who accept responsibility for
their acts deserve lesser punishments.   *Id.*

Ingrid is a true first-time offender with no previous
arrests. Her offense was not a crime of violence and there is no
individual victim in this case. While the amount of money at
issue here is substantial from anyone's perspective, it
represents an extremely small portion of Tiffany's profits and
its loss has not significantly impacted Tiffany's ability to be
the premier provider of jewelry to the rich. Ingrid has accepted
full responsibility for her actions and understands that she
must make restitution. This places Ingrid in the category of
defendants for whom Congress specifically recommends a non-
custodial sentence: 28 U.S.C. § 994(j) states that a sentence
other than prison is generally appropriate for the "first
offender who has not been convicted of a crime of violence or an
otherwise serious offense."

In light of these circumstances, Probation was correct to
recommend a six-month sentence followed by supervision. Such a

sentence represents sufficient punishment for Ms. Okun. This offense has already cost Ms. Okun so much: it has ended a 30-year career, ended a marriage, and caused extreme humiliation before her co-workers and the public. Whatever savings and assets she has have been or will be given to the government as restitution. *Adelson*, 441 F. Supp. 2d at 514 (noting that an important kind of retribution may be achieved through financial penalties). As a felon, Ms. Okun may be barred from voting and serving on a jury, and will have significantly limited employment opportunities.

Further, as the Supreme Court has recognized, even non-custodial supervision represents a substantial impediment on an individual's freedom: "Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their probation officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excessive drinking." *Gall*, 522 U.S. at 48 n.4. They can also be subject to additional conditions, including financial restrictions and searches. Thus, six months plus supervision represents a just and adequate punishment.

### D. **A Six Months Sentence Provides Adequate Deterrence Under the Circumstances**

Another factor that the Court must consider in imposing punishment is the need for adequate deterrence.  18 U.S.C. § 3553(a).  On an individual level, the Court should recognize that a sentence of imprisonment is not necessary to deter Ms. Okun from further criminal acts. As described above, her arrest and the media frenzy it engendered have already had a powerful impact on her. She felt an extreme sense of shame when her illegal acts were discovered, as well as the humiliation of being handcuffed, locked up and publicly reprimanded. This arrest and conviction forced her to seek help for her psychological problems, and she is for the first time receiving counseling. This counseling will ensure that she never degenerates to the state of depression and isolation that precipitated this conduct and offense. Ms. Okun's long life of law-abiding behavior prior to this offense and the somewhat unique circumstances surrounding the crime also show that she is extremely unlikely to recidivate even without a prison term.

Furthermore, the Sentencing Commission's own historical studies support the idea that Ingrid is an extremely low risk for recidivism.  *See Recidivism and the "First Offender"* at 13-14.  The Commission has calculated that individuals such as Ingrid - people with no prior arrests or convictions - have a

25

recidivism rate of 6.8%, significantly lower than individuals with prior criminal incidents.[2]  *Id.*  Ms. Okun also has a majority of characteristics that are correlated with lower recidivism rates:  she is a woman, she is nearly 50 years old, she maintained stable employment in the years prior to her arrest, she attended college, she has never used drugs, and she committed a larcenous offense.  *See* U.S. Sentencing Commission Research Series on the Recidivism of Federal Guideline Offenders, *Measuring Recidivism: Criminal History Computation of the Federal Sentencing Guidelines* at 12-13 (May 2004), available at http://www.ussc.gov/ publicat/Recidivism_General.pdf.  For all of these reasons, there is absolutely no basis to conclude that a lengthy imprisonment is necessary to deter Ingrid from committing future crimes.

In this regard, the hoary belief that a term of incarceration provides more effective deterrence has been discredited. The Commission's own studies have revealed that individuals are actually *more likely* to re-offend if they are sentenced to prison rather than straight probation.  *See Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15.   The Commission has

---

2  In the study recidivism was defined to include both new convictions and supervision violations. The rate of new convictions for first offenders is 2.5%. *Id.* at 13-14.

speculated that alternatives to incarceration effectively "divert offenders from the criminogenic effects of imprisonment which include contact with more serious offenders, disruption of legal employment, and weakening of family ties." U.S. Sentencing Commission Staff Discussion Paper, *Sentencing Options Under the Guidelines* at 19 (Nov. 1996), available at http://rashkind.com/alternatives/dir_00/ USSC_sentencingoptions.pdf; Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime and Justice: A Review of Research 28-29 (2006) (finding that increases in severity of punishments do not yield significant (if any) marginal deterrent effects). *See also United States v. Beiermann*, 599 F. Supp. 2d 1087, 1103-04 (N.D. Iowa 2009) ("Experience in other criminal cases . . . surely does not support the hope that harsh sentences will end illegal activity. . . . [T]he sentence should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of.").

This general principle extends to white-collar cases. In a survey of the pre-Guidelines period, researchers found no measurable difference in deterrence, or recidivism rates, between defendants who received sentences of imprisonment versus

those who received probation.  *See* David Weisburd, et al., *Specific Deterrence in a Sample of Offenders Convicted of White-Collar Crimes*, 33 Criminology 587 (1995).  As Michael Tonry writes, while having a system of punishments certainly deters, "There is no good evidence that justifies fine-tuning sentences in individual cases . . . for deterrent reasons." Tonry at 29.

Finally, even if there were any marginal general deterrent effect from a longer sentence of imprisonment, this effect is greatly outweighed by the other factors in this case, which uniformly counsel in favor of a six month non-guidelines sentence.  The Court should not allow abstract and empirically-unsupportable arguments about general deterrence to override the other sentencing factors and the obligation under 18 U.S.C. § 3553(a) to determine which sentence is most appropriate for Ms. Okun as an individual with no criminal history or history of violence or prior bad acts.

Ultimately, the recommended and requested sentence will be more beneficial to the public by furthering Ms. Okun's rehabilitation. The best chance Ingrid has for making full restitution is by getting a job, working and paying the United States. Similarly, any lengthy period of incarceration would also potentially interfere with the important mental health treatment Ms. Okun has started.  She is undergoing counseling

28

and treatment for the first time in her life, and her depression
has improved somewhat. She is just starting to have a healthy
relationship with her therapist, which is a first for Ingrid.
Because of the extent that her mental health issues contributed
to Ingrid's disintegration and her offense, treatment of these
problems is the best way to ensure her rehabilitation and to
meet the goals of sentencing.

## CONCLUSION

Ms. Okun deeply regrets her criminal conduct.  She has
acknowledged her mistakes and fully accepted responsibility.
She is determined to make restitution and to move forward with
her life.  She has begun receiving counseling and has moved away
from her previous life of isolation and depression.  Given all
this, Ms. Okun is neither a threat to herself or a danger to the
community.  Her experiences to date in this case have
effectively deterred her from further criminal conduct, and
there is no rational basis to conclude that a more severe
punishment would have greater deterrent effects. For these
reasons, the Court should follow the recommendation of the
Probation Department and impose a sentence of six months in
jail. Such a sentence would be sufficient but not greater than
necessary to accomplish the primary aims of sentencing under

section 3553(a), including punishment, deterrence and

rehabilitation.


Dated:   New York, New York
         December 18, 2013


                         Respectfully submitted,

                         David E. Patton, Esq.
                         Federal Defenders of New York, Inc.


                         By:_____
                             Sabrina Shroff, Esq.
                             Attorney for Ingrid Lederhaas Okun